RAWLS, Judge.
Appellant-plaintiff Worthington sued ap-pellee-defendant Diehl for breach of contract, claiming damages in count one for the alleged unpaid balance of the contract price in the sum of $28,714.55 and in count two for additional labor and materials furnished in the sum of $25,121.75. Diehl denied any indebtedness and counterclaimed against Worthington for breach of contract and 'misrepresentation in the sum of $100,-000. A jury verdict and judgment was rendered for Diehl in the sum of $21,000 from which Worthington has appealed.
Diehl contracted to furnish and install extensive air conditioning facilities in the Tallahassee Memorial Hospital. The plans were detailed and referred to various components of the proposed system as AU-1 through AU-7, of which AU-5 and AU-7 were high pressure primary air units.[1] On November 13, 1956, Worthington submitted to Diehl (and other potential contractors) a proposal to furnish the air conditioning machinery[2] called for in the plans and specifications for the sum of $113,000. This offer contained a warranty clause limiting Worthington’s liability for defective machinery to replacement of such machinery or parts. On February 14, 1957, Diehl issued his purchase order accepting Worth-ington’s offer. On March 29, 1957, an instrument referred to by Diehl as a supplementary agreement, was executed by Worthington which instrument detailed the capacities of the system, recited certain modifications of equipment to conform to the specifications, and stated that engineer *886 ing data would be furnished by Worthing-ton within a week or ten days.[3]
Everything progressed fairly smoothly between the parties until the summer of 1958 when it was determined that the two primary air handling units, AU-5 and AU-7, were not functioning properly. Diehl claimed that Worthington had not properly balanced the system and that the failure of the system was Worthington’s responsibility. Worthington claimed that excessive air leakage existed in the duct work system installed by Diehl. Both parties cooperated in trying to remedy the problems — Diehl through removing, recovering, and again installing considerable duct work which constitutes a basis for a large part of his counterclaim — Worthington through the designing and installation of larger motors and fans, together with extensive engineering tests and experiments pertaining to individual components of the overall system. Finally, after spending more than a year testing and changing parts, Worthington concluded that the original design of the duct work by the hospital’s architects and engineers was the cause of the trouble in that an elbow only 49 inches from the blower acted as a bottleneck, throwing the air back and causing a turbulence in that section.
Worthington takes the position that its contract with Diehl was for the sale of machinery and equipment, therefore: (1) The express terms of the warranty clause limited its liability to the replacement of any defective parts or materials. (2) When Diehl discovered the alleged defect in the machinery and equipment, and called on Worthington to repair said defect, Diehl' waived any right to claim a breach of the-contract by retaining the machinery so installed. Diehl argues: (1) The initial contract was modified and superseded by the written agreement dated March 29. (2) The warranty clause is applicable only to-individual stock items. (3) The contract required Worthington to supervise the testing and balancing of the entire system.[4]
Extensive testimony and documentary evidence was presented to the jury from: which it could have concluded that Worth-ington agreed to furnish equipment necessary for an entire air conditioning system which would produce the quantity, temperar ture, etc., of air and otherwise perform in accordance with requirements of the plans and specifications (which included detailed' design of the duct work) ; that the system furnished by Worthington failed to so perform because of the faulty duct work which Worthington, as an expert in the field of air conditioning systems, should have initially detected and insisted upon correction thereof before the machinery and equipment was constructed and installed; that because of Worthington’s failure to discharge the responsibility undertaken by it for correcting any fault in the design of the duct work, it breached its contract which proximately resulted in the damages suffered by Diehl for which he was awarded a verdict. Evidence supporting such findings is summarized as follows:
1. Worthington prepared the schedule of equipment from the plans and specifications prepared by the Tallahassee Memorial Hospital engineers and *887 architects and agreed to supervise the testing and balancing of the system.
2. Worthington knew that this was the first high pressure system being installed in “this part of the country”.
3. Worthington had previously furnished the equipment for similar high pressure air conditioning systems in other parts of the country and represented to Diehl that it was well qualified to furnish the proper equipment for the Tallahassee Memorial Hospital job.
4. By its agreement executed on March 29, 1958, Worthington specifically contracted with Diehl that its equipment outlined in the proposal would furnish certain quantities of air within a specific range of temperature, which it did not do.
5. Worthington advised Diehl that its equipment was balanced and subsequently admitted that the system was not balanced.
As is so often the case in contractual disputes, the real issue presented to the trial court was the construction of the written instrument together with the conduct of the litigants in an effort to arrive at the intention of the parties. On that predicate, we conclude that the verdict and the judgment must be sustained.
Worthington insists that the warranty clause contained in its initial proposal limited its liability. The limitation of liability contained in the warranty clause is obviously directed toward standard manufactured items. It is apparent that, if for instance, any of the electric motors had been defective, Worthington’s liability would have been limited as provided in said clause. However, the jury had before it sufficient evidence from which it could conclude that Worthington expressly agreed that its equipment would furnish a specific quantity and quality of air in various rooms of the building through the designed duct work, and sufficient factual conflict was adduced from which a jury could have properly found that Worthington failed to perform. With reference to such a conclusion it is obvious that the warranty clause was not intended to relieve Worthington from its liability for such a breach of contract and the trial court was correct in so finding.
Affirmed.
WIGGINTON, Acting C. J., and STUR-GIS, J., concur.

. It is significant that this was the first installation of a high pressure system in “this part of the country.”

. “ITEM # 1
One (1) — ‘WORTHINGTON Model 560 26-26 Centrifugal Refrigeration System with Motor and Starter for 460 volts 3 phase, 60 Oyele, automatic suction damper and miscellaneous accessories including Freon and Oil and Instruction of Owner’s Operator.
“ITEM # g 298 — WORTHINGTON R & O Induction Units arranged for Horizontal Ceiling Mounting but less mounting brackets, lint screen and supply and return air grilles, but including auto-matic control valve with control knob and wall plate.
“ITEM # 3 One lot of spiral lockseam-round conduit including sound absorbers, fitting, flexible hose, fire dampers and volume dampers, rubber cement and thinner.
“ITEM # 4 One Lot of Central Station Air Conditioning Units described as Units AU-1 through AU-7 of which AU-5 and AU-7 are High Pressure Primary Air Units, and AU-2 and AU-4 are sprayed coil Units. Price includes Fans and Motors, Pumps and Motors, but less Starters, Cleanable filters as specified.
“ITEM # 1 This proposal also includes supervision for testing and balancing of the induction system and Units.”

. “AU-5 will cool the air from an entering temperature of 95.0 deg. F. D. B. * * * Fan will handle 8835 CFM @ 5.68“ ext. S. P. and be equipped with a 20 HP * * * AU-7 will cool air from an entering temperature of 95.0 deg. F. D. B. * * * Fan will handle 6556 CFM @ 6.49" Ext S. P. and be equipped with a 15 HP * * * We are revising our standard drawing to conform to specifications and these certified drawings with complete engineering data will be available witbin a week to ten days.”

. One of Worthington’s air conditioning engineers testified: “Balancing is adjusting each one of the individual room units to the CFM which they were selected or specified for or the proportion of the air which is available from the primary units.”